IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Ashley L. Swain, *Individually and as a Representative of the Class*, | Case No. 3:13 CV 1727 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER DISMISSING <u>CLASS ACTION COMPLAINT</u> |
| -vs- | JUDGE JACK ZOUHARY |
| Wells Fargo Bank, N.A., et al., | |
| Defendants. | |

## INTRODUCTION

This Court must decide whether mortgage language requiring minimum flood insurance, crafted by a federal agency and appearing in millions of contracts, bars a lender from demanding flood insurance coverage equal to replacement cost.

Plaintiff Ashley Swain ("Swain") argues "yes," or as a fallback, "perhaps." Arguing "yes," she claims the relevant language only allows a lender to demand flood insurance coverage in the amount required by federal law, which is less than replacement cost. Arguing "perhaps," she asserts the contract language is ambiguous, and therefore cannot be definitively construed on this Motion to Dismiss the Class Action Complaint (Doc. 27). Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank"), Wells Fargo Home Mortgage, Inc. ("Wells Fargo Home") and Wells Fargo Insurance, Inc. ("Wells Fargo Insurance," and collectively with the other Wells Fargo entities, "Wells Fargo") contend the language is clear: it allows a lender to demand flood insurance coverage in excess of that required by federal law. This Court agrees with Wells Fargo and, for the reasons below, dismisses this action with prejudice.

## BACKGROUND

**The Mortgage**

In July 2012, Swain purchased a home in Carey, Ohio for just shy of $49,000 (Doc. 1 at ¶ 23). She financed the full purchase price with a loan obtained from First Federal Savings and Loan Association of Lakewood ("First Federal"). First Federal secured the loan with a mortgage on the property (*id.*).

Swain's home lies in a "Special Flood Hazard Area" (¶ 24). A federally-insured lender may accept such property as collateral, but the lender must ensure the property carries flood insurance (¶ 25). Prior to closing, First Federal directed Swain to obtain flood insurance coverage equal to the loan's principal balance of $49,000 (¶ 26). Swain complied, obtaining a policy from Nationwide Insurance with an annual premium of $537 (¶¶ 31–32). *See also* Doc. 1-8. Swain paid the premium at the time of closing, using her escrow account (¶¶ 33–35).

First Federal described this flood insurance obligation to Swain in a series of documents provided at or before closing. First, in a document titled "Mortgage Loan Commitment," First Federal explained "Federal law requires that flood insurance, available through any agent, be written in either the maximum amount available or the loan balance, whichever is less" (¶ 27; Doc. 1-6). Second, Paragraph 4, one of several "uniform covenants" in Swain's mortgage and discussed in detail below, establishes contractual rights and obligations related to "Fire, Flood[,] and Other Hazard Insurance" (Doc. 1-5 at 3). *See also* Doc. 1-7.

**The Change in Coverage**

In August 2012, First Federal assigned mortgage servicing to Wells Fargo Home (¶ 36), and the mortgage itself to Wells Fargo (¶ 37). Swain was told the change "does not affect any term or

condition of the mortgage instruments, other than terms directly related to the servicing of the loan" (Doc. 1-10 at 1) and "transfer of ownership of your mortgage [required] no action [by] you" (Doc. 1-11).

Wells Fargo wrote Swain in November 2012, stating "[o]ur records indicate that the amount of coverage provided by your current flood insurance is less than the coverage required by Wells Fargo Home Mortgage" (¶¶ 40–41; Doc. 1-12 at 1). This "Flood Insurance Coverage Deficiency Notification" directed Swain to obtain, within forty-five days, flood insurance at "replacement cost coverage" (¶¶ 42–45). In Swain's case, "replacement cost coverage" equaled coverage of $170,000 (¶ 52). Wells Fargo informed Swain that if she failed to timely obtain this greater coverage level, it would obtain flood insurance through Wells Fargo Insurance, "an affiliate" of Wells Fargo; Wells Fargo would "be compensated"; and that in "nearly all instances" lender-placed insurance is more expensive than borrower-obtained flood insurance (¶ 52).

Swain obtained replacement cost coverage within forty-five days, increasing her annual flood insurance premium from $537 to $1,189 (¶ 53). In December 2012, Wells Fargo charged Swain's escrow account to cover the additional premium (¶ 55). Swain's flood insurance premium junmped yet again to $1,981 for the July 2013 to July 2014 premium year (¶ 60).

Though Swain obtained replacement cost coverage on her own, she alleges other members of the putative class did not. In such cases, Wells Fargo would "force-place" flood insurance obtained from affiliated companies, including American Security Insurance Co. ("ASIC") and QBE Insurance Corp. ("QBE") (¶ 61). Swain alleges that "Wells Fargo and [Wells Fargo Insurance] entered into exclusive purchasing agreements with ASIC and QBE pursuant to which [Wells Fargo Insurance] would act as the 'broker' or 'agent' for force-placed insurance policies purchased on behalf of Wells

3

Fargo's borrowers and would receive a guaranteed commission equal to 10% to 20% of the premium for each policy" (¶ 62). Wells Fargo would then send a "Notice of Temporary Flood Insurance" to the mortgagee, explaining that force-placed insurance had been obtained and repeating "Wells Fargo's unilateral demand that the Class member provide additional flood insurance" (¶ 50).

**Plaintiff's Legal Claims**

Swain asserts this factual background supports five grounds of relief. First, Swain claims Wells Fargo Bank violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, when it misrepresented to Swain and members of the putative class that they must obtain flood insurance coverage in excess of that required by federal law, and then "adversely chang[ed]" mortgage loan terms without borrower consent or proper notice (¶¶ 81, 86–87). Second, Swain alleges Wells Fargo Bank and Wells Fargo Home Mortgage breached the mortgage "by requiring [her] to obtain flood insurance in excess of her principal balance and by force-placing flood insurance in excess of her principal balance" -- though, again, Swain avoided lender-placed insurance (¶ 103). Third, Swain claims Wells Fargo Bank and Wells Fargo Home Mortgage breached the covenant of good faith and fair dealing by (among other things) modifying her flood insurance obligation (¶ 111). Fourth, Swain avers that all Defendants violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 1601, *et seq.*, by accepting unlawful "kickbacks" and "other things of value in connection with an agreement or understanding to purchase lender-placed flood insurance from their lender-placed flood insurance carrier" without performing commensurate work for those payments (¶ 121). Fifth, Swain charges that all Defendants have been unjustly enriched by requiring flood insurance coverage equal to replacement cost value and accepting kickbacks from lender-placed insurance providers (¶¶ 131–33, 135–36 ).

4

**STANDARD OF REVIEW**

In scrutinizing a complaint under Federal Civil Rule 12(b)(6), a court is required to "accept all well-pleaded factual allegations" as true and "construe the complaint in the light most favorable to" Swain. *Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). Although a complaint need not contain "detailed factual allegations," it cannot rely solely on "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a complaint may survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**DISCUSSION**

Paragraph 4 controls the outcome of this case. As an FHA-insured lender offering Swain an FHA-insured mortgage, federal law required First Federal to include Paragraph 4 in Swain's mortgage contract. 24 C.F.R. § 203.17(a)(2)(i)(A). Twenty-five years ago, the Department of Housing and Urban Development ("HUD"), acting through the notice-and-comment process, authored the disputed text. *See* Requirements for Single Family Mortgage Instruments, 54 Fed. Reg. 27,596, 27601 (June 29, 1989) ("Mortgagees must use the model form . . . with only such adaptation as may be necessary to conform to state or local requirements. . . . [P]aragraphs 1-10 must be used verbatim."); Requirements for Single Family Mortgage Instruments, 53 Fed. Reg. 25434, 25438 (July 6, 1988) (notice of proposed policy containing text of Paragraph 4). This "covenant is included in millions of mortgage contracts across the country. It does not vary by lender or borrower." *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1102 (11th Cir. 2014). It reads:

5

> **Fire, Flood and Other Hazard Insurance:** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be *maintained in the amounts and for the periods that Lender requires*. Borrower shall *also* insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods *to the extent required by the Secretary*.

(Doc. 1–5 at 3) (emphases added).

The parties offer conflicting readings of Paragraph 4. Briefly stated, Wells Fargo argues Paragraph 4 sets a "floor" on the amount of flood insurance coverage that a mortgaged property must carry -- that is, "to the extent required by the Secretary," which for a Special Flood Hazard Area property means coverage equal to the lesser of (1) the loan's principal balance or (2) $250,000. *See* 24 C.F.R. § 203.16a(c). In addition to that "floor" amount of flood insurance, Paragraph 4 authorizes a lender to require more flood insurance coverage -- that is, "in the amounts . . . that Lender requires." Swain reads Paragraph 4 in one of two ways: either (1) Paragraph 4 sets a "ceiling" on the amount of flood insurance coverage that Wells Fargo may demand -- *only* "to the extent required by the Secretary," and no more than that amount -- or (2) Paragraph 4's meaning is ambiguous, and cannot be determined as a matter of law on a motion to dismiss.

The federal courts are divided on this issue. Generally, relevant decisions fit one of two molds. One series of cases finds Swain's interpretation of Paragraph 4 to be at least reasonable, and therefore ambiguous under traditional principles of contract interpretation. *See, e.g.*, *Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255, 262 (N.D.N.Y. 2013); *Morris v. Wells Fargo Bank N.A.*, 2012 WL 3929805 at *7–8 (W.D. Pa. 2012). Another series of cases -- including the only federal courts of appeals to have addressed this issue -- examine Paragraph 4 using principles of contract interpretation specific to uniform covenants. *See, e.g.*, *Feaz*, 745 F.3d at 1106; *Kolbe v. BAC Home*

6

*Loans Serv., LP*, 738 F.3d 432, 436 (1st Cir. 2013) (lead opinion of equally divided en banc court). These courts determine the meaning of Paragraph 4 as a matter of law, granting motions to dismiss on the grounds that Paragraph 4 permits a lender to require flood insurance coverage at levels greater than the borrower's principal loan balance. Because the *Feaz* approach finds support in Ohio law and best advances the relevant federal regulatory purpose, this Court concludes Paragraph 4 unambiguously allows Wells Fargo to require flood insurance coverage equal to replacement cost value.

### Principles of Contract Interpretation

The construction of written contracts is a question of law. *Latina v. Woodpath Dev. Co.*, 57 Ohio St. 3d 212, 214 (1991). "In construing the terms of a written contract, [this Court's] primary objective is to give effect to the intent of the parties, which is presumed to rest in the language they have chosen to employ." *Triangle Prop., Inc. v. Homewood Corp.*, 2013-Ohio-3926, at ¶ 21 (Ohio Ct. App. 2013). "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App. 3d 45, 55 (1998).

However, different rules of contract interpretation apply where, as here, a federal agency wrote the disputed contract language, and the parties adopt the disputed contract language because federal law requires them to do so. In those circumstances, Ohio law gives meaning to disputed contract language by looking first to relevant legislative design. *See Reagans v. MountainHigh Coachworks, Inc.*, 117 Ohio St. 3d 22, 27 (2008).

In *Reagans*, the Ohio Supreme Court determined "the effect of [a Federal Trade Commission]-mandated notice included in [a] loan disclosure, note, and security agreement between the bank and

7

the buyers" of an $85,000 motor home. *Id*. That notice, implementing the so-called "Holder Rule," read:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

*Id*. at 24–25. This notice matched, word-for-word, form language prescribed by federal regulation. *See* 16 C.F.R. § 433.2(a).

The buyers sued the motor coach dealer and manufacturer ("the sellers") for selling what turned out to be a lemon, obtaining under the Ohio Consumer Sales Practices Act ("OCSPA") a $200,000 judgment against the sellers -- trebled actual damages, plus attorneys' fees. The buyers also sued the bank, lender of the consumer credit loan, alleging the Holder Rule notice made the bank derivatively liable for the OCSPA judgment. The buyers claimed the trial court "erred in failing to impose against the bank the judgment against the seller for treble damages and attorney fees." *Id.* at 26. *See also id*. at 30 ("[T]he bank's derivative liability for the seller's misconduct under the [OCSPA] exists only to the extent that the FTC notice requires such derivative liability."). After all, the Holder Rule Notice made the bank "SUBJECT TO *ALL* CLAIMS . . . WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF THE GOODS." That expansive language would seem to encompass the successful OCSPA claim.

The Ohio Supreme Court instead read the Holder Rule notice to hold the bank liable only for "the actual, compensatory damages incurred in the consumer contract with the seller," not "additional awards intended as penalties against sellers." *Id.* at 32. The court did not base that conclusion on unambiguous contract language or party intent. Noting that it dealt with an "FTC-mandated notice,"

8

the court "beg[a]n with a discussion of the FTC rule, and its purpose," *id.* at 27, and it ended with that discussion. *See id.* at 30–32 (examining legislative design).

Thus, Ohio law emphasizes legislative design when construing FTC-crafted language appearing verbatim in all contracts of a certain type (consumer credit contracts) because one federal agency (the FTC) mandates those terms. Here, this Court must construe HUD-crafted language appearing verbatim in all contracts of another type (FHA-insured mortgage contracts) because another federal agency (HUD) mandates those terms. *Feaz* and *Kolbe*'s lead opinion explain in great detail why the relevant legislative design yields only one reasonable reading of Paragraph 4. *See Feaz*, 745 F.3d 1105–10; *Kolbe*, 738 F.3d at 447–53 (lead opinion). The United States, as *amicus curiae* in *Feaz*, summarized that legislative design:

> Paragraph 4 implements [the minimum flood insurance requirement] by obligating the borrower to maintain at least the minimum amount of flood insurance set by federal law, while *also* allowing the lender to require additional flood insurance if the lender believes it is necessary. Plaintiff[, who pushed a reading similar to Swain's,] would turn that regulatory scheme on its head . . . . [T]hat interpretation disregards the plain language of Paragraph 4, which unambiguously authorizes the lender to require the borrow to obtain insurance against *any* "hazards, casualties, and contingencies," including floods, "in the amounts and for the periods that the lender chooses."

Doc. 27-1 at 9–10 (emphasis in original). *See also* Doc. 27-2 at 7–8 (2007 FEMA statement, encouraging lenders to require flood insurance coverage equal to replacement cost value). This Court adopts the reasoning in *Feaz*. As a matter of law, Wells Fargo may demand that Swain obtain flood insurance coverage equal to replacement cost value.

**Breach of Contract**

To succeed on a breach of contract claim, "a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Jarupan*

9

*v. Hanna*, 173 Ohio App. 3d 284, 294 (2007) (quotation marks omitted). "A party breaches a contract if [the party] fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (applying Ohio law).

Paragraph 4 allows Wells Fargo to require flood insurance coverage equal to replacement cost value -- the asserted breach. Swain does not dispute Wells Fargo's calculation of that level of insurance coverage, or otherwise show her contract claim survives under a *Feaz*-like reading of Paragraph 4. She fails to state a breach of contract claim.

**Implied Covenant of Good Faith and Fair Dealing**

Because Swain fails to state a breach of contract claim, her claim for breach of the implied covenant of good faith and fair dealing also fails. "Ohio law does not recognize a claim for breach of the implied covenant[] of good faith and fair dealing independent of a breach of contract claim." *Nachar v. PNC Bank, Nat. Ass'n*, 901 F. Supp. 2d 1012, 1019 (N.D. Ohio 2012). "[T]he covenant of good faith is part of a contract claim, and does not stand alone as a separate cause of action from a breach of contract claim." *Tabor Revocable Trust v. WDR Prop., Inc.*, 2010 WL 1840738, at *6 (Ohio Ct. App. 2010) (quotation marks omitted).

Moreover, "[a]n obligation of good faith generally arises only where a matter was not resolved explicitly by the parties." *Myers v. Evergreen Land Dev. Ltd.*, 2008 WL 650774, at *5 (Ohio Ct. App. 2008). As the Ohio Supreme Court explained:

10

> Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

*Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St. 3d 433, 443–44 (1996) (quotation marks omitted). Parargraph 4 does not specify the precise flood insurance coverage a mortgaged property must carry. But Paragraph 4 does allow Wells Fargo to determine that coverage amount, subject to the floor established by HUD. Wells Fargo is entitled to enforce that contract provision "to the letter"; it did not breach the implied covenant of good faith.

**Unjust Enrichment**

"Unjust enrichment is an equitable doctrine that allows recovery where a [p]laintiff can establish: '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.'" *Transp. Ins. Co. v. Busy Beaver Bldg. Centers, Inc.*, 969 F. Supp. 2d 875, 891 (S.D. Ohio 2013) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183 (1984)).

In this action, Swain alleges that the "kickbacks, commissions and other compensation that Wells Fargo received in connection with force-placed flood insurance were not legitimately earned" and that "it would be unjust and inequitable for Wells Fargo to retain such benefits" (¶¶ 136–37). Swain also stresses a different "unjust benefit" -- not the alleged lender-placed-insurance commissions Wells Fargo received from an affiliate, but rather Wells Fargo's improved risk profile on Swain's

11

loan, the product of Wells Fargo's demand for flood insurance coverage equal to replacement cost value (Doc. 30 at 27) ("Ms. Swain's unjust enrichment claim is that, at her expense, Wells Fargo protected itself against the risk it undertakes in FHA-insured loans.").

Under either theory, Swain fails to state an unjust enrichment claim. Because Swain did not have lender-placed insurance, Wells Fargo received no "kickback" in connection with her mortgage. *See Kolbe*, 738 F.3d at 455 (lead opinion). And Swain's risk-profile theory fails because Paragraph 4 allows Wells Fargo to obtain the loan risk profile that follows a demand for flood insurance coverage equal to replacement cost value.

**Violations of TILA and RESPA**

Swain contends that Wells Fargo violated TILA by (1) misrepresenting the amount of flood insurance she was required to maintain, (2) adversely changing the terms of the mortgage agreement, and (3) failing to give proper notice of amended loan terms, or to obtain consent to the amended terms. The TILA claim rests on Swain's reading of Paragraph 4, which this Court rejects.

Finally, Swain argues that Wells Fargo violated RESPA by accepting unlawful "kickbacks" and "other things of value in connection with an agreement or understanding to purchase lender-placed flood insurance from their lender-placed flood insurance carrier" without performing commensurate work for those payments from affiliated companies (¶ 121). RESPA provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). "Settlement services" is defined by 12 U.S.C. § 2602(3) as:

12

> [A]ny service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement.

Swain argues that because Wells Fargo required her to increase her insurance coverage several months after closing, Wells Fargo's flood insurance demands were "connected with" closing for purposes of RESPA. Again, Wells Fargo did not receive a "kickback" in connection with Swain's mortgage. Further, courts have rejected attempts to broaden the term "settlement services" to include the purchase of insurance, force-placed or not, occurring after settlement. *See, e.g.*, *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1048 (N.D. Cal. 2013) ("Because settlement is, in essence, the closing of the loan, a number of courts have found that no RESPA claim is viable based on an allegation that the defendant force placed insurance *after* the closing of the loan.") (emphasis in original). This Court follows suit.

### Leave to Amend

Swain asks for leave to amend the Class Action Complaint in the event Wells Fargo prevails on its Motion (Doc. 30 at 28 n.23). Leave to replead may be denied if an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Swain's claims fail because, as a matter of law, Paragraph 4 authorizes Wells Fargo to demand flood insurance coverage equal to replacement cost value. More careful pleading cannot cure that central defect.

**CONCLUSION**

The result in this case may seem a bit unfair. A homeowner signs a mortgage which includes a clause that allows the lender, or a subsequent lender, to increase the mortgage payment by requiring additional flood insurance. That is what the clear language of the mortgage says. The increase is not without limit -- here, the ceiling is replacement cost as opposed to the loan balance. This ceiling is reasonable. The additional premium paid by the homeowner was three times the original cost of flood insurance. This is bothersome. However, besides competing readings of mortgage text, there are no allegations of wrongdoing, such as excessive charges above the ceiling, that would lead to a different result.

Counsel have not cited any Sixth Circuit precedent helpful in deciding the central issue in this case. This is surely a case for the Sixth Circuit to address. A different result could occur if *Reagans* and *Feaz* are not applied. But, as this Court sees it, *Reagans* and *Feaz* do apply and therefore the result is what it is. For the foregoing reasons, the Motion to Dismiss (Doc. 27) is granted and the Class Action Complaint is dismissed.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 18, 2014